**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald J. SMITH, James J. Marren, and Gerald T. Louison, Defendants–Appellants.**

**Nos. 91–2297, 91–2563 and 91–3143.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1992.

Decided May 3, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied July 12, 1993.

Joseph Saint–Veltri (argued), Denver, CO, for Ronald J. Smith.

Lynn A. Hirschfeld (argued), Chicago, IL, for James J. Marren.

John Speroni (argued), Marion, IL, for Gerald T. Louison.

Before RIPPLE and KANNE, Circuit Judges, and LEINENWEBER, District Judge.*

KANNE, Circuit Judge.

This case requires us to revisit the Lanier/Kramer drug ring which has kept this court busy with numerous appeals over the past few years. For the sake of brevity, we will set forth only a general overview of the drug ring's operations and relate specific facts pertinent to each defendant's appeal as necessary.[1]

Randy Lanier and Benjamin Kramer were partners in the marijuana importation business. Initially, the two men imported small amounts of marijuana, about 15,000 pounds, on small boats. However, as time progressed, the men were responsible for importing barge loads of marijuana, each containing approximately 150,000 pounds. From 1982 to 1986, there were seven episodes of marijuana smuggling planned and executed by Lanier and Kramer.

As with any commercial product, Lanier and Kramer had to devise ways of marketing and distributing the marijuana and secure people to help them implement these plans. To facilitate the distribution of such large amounts of marijuana, Lanier and Kramer utilized "major customers" in various cities throughout the United States. During the relevant time frame, Lanier and Kramer had three "major customers": Ron Ball, Chris Holdorf, and the partnership of Jeff Tuchband and David Tobias. Each of these customers, in turn, had primary customers of their own. After a shipment of marijuana arrived in this country, the three "major

Frederick J. Hess, U.S. Atty., Robert T. Coleman, Asst. U.S. Atty., Office of the U.S. Atty., Fairview Heights, IL, and Michael C. Carr, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Benton, IL, for the U.S.

---

* The Honorable Harry D. Leinenweber, District Judge for the Northern District of Illinois, is sitting by designation.

1. For more factual background on the Lanier/Kramer conspiracy, see *United States v. Thornton*, 972 F.2d 764 (7th Cir.1992); *United States v. Kramer*, 955 F.2d 479 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *United States v. Canino*, 949 F.2d 928 (7th Cir. 1991); *cert. denied*, — U.S. —, 112 S.Ct. 1701, 118 L.Ed.2d 410 (1992).

customers" were responsible for coming to the barge location, picking up their share of the marijuana and transporting it to stash houses in their area.

After extensive police work, the Lanier/Kramer organization was put out of business. A large number of individuals throughout the country were indicted as members of the Lanier/Kramer marijuana importation and distribution conspiracy. Several of these individuals were convicted, convictions we upheld on appeal. This case requires us to address three more convictions arising from the Lanier/Kramer conspiracy, those of James Marren, Ronald Smith and Gerald Louison. Unpersuaded by the defendants' arguments, we affirm both their convictions and their sentences.

*Procedural History*

On September 29, 1987, Marren was indicted, along with twenty other defendants, for conspiracy to distribute marijuana. The indictment alleged that the conspiracy ran from March 1980 through June 1987. Marren proceeded to trial on November 15, 1988 with five codefendants. On November 29, 1988, after Marren's counsel's opening statement, the government moved to disqualify Marren's attorney, Stephen Finta. Following a hearing, the trial court concluded that Finta might have been involved in the drug conspiracy and disqualified him. That same day, the court declared a mistrial as to Marren.

On March 2, 1989, Marren was charged with conspiracy in a superseding indictment. Marren filed a motion to dismiss based on double jeopardy, which was denied.[2] On May 31, 1990, a grand jury issued another superseding indictment charging Marren, Smith and Louison (and eleven others) with conspiracy to knowingly and intentionally distribute more than 1,000 pounds of marijuana from in or about January 1978 to June 1987 in violation of 21 U.S.C. §§ 841(a)(1) and 846.

A joint trial began on December 3, 1990. All three defendants repeatedly filed motions for severance which were denied. On January 10, 1991, all three defendants were con-

victed. On appeal, the defendants claim several errors require reversal of their convictions or, at least, resentencing. We address each in turn.

*Variance/Sufficiency of the Evidence*

According to the defendants, the government's evidence at trial did not prove the existence of the single conspiracy alleged in the indictment, but rather proved, if anything, the existence of multiple conspiracies. The defendants claim that this alleged variance substantially prejudiced them. The challenge the defendants present is an all too familiar one for which we have several clearly established legal principles to guide our inquiry.

A conspiracy exists when two or more individuals agree to join together to commit an illegal act. *United States v. Curry*, 977 F.2d 1042, 1053 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993). "The crime of conspiracy focuses on agreements, not groups." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). Thus, the government need prove only that the defendant knew of the agreement and intended to join it; the government need not prove specifically with whom the defendant conspired or that he even knew the other conspirators. *Id.* Furthermore, a conspiracy conviction may be based solely on circumstantial evidence. *Curry*, 977 F.2d at 1053.

The defendants' variance claim is really "a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *Townsend*, 924 F.2d at 1389. The difference between a single conspiracy and multiple conspiracies has been defined by this court. "If there is one overall agreement among various partners to perform different functions in order to carry out the objectives of the conspiracy, the agreement constitutes a single conspiracy." *United States v. Gonzalez*, 933 F.2d 417, 437 (7th Cir.1991). In contrast, if each of the conspirators' agreements has its own end or is an end itself, then multiple conspiracies exist.

---

**2.** We affirmed that denial in *United States v.* *Marren*, 919 F.2d 61 (7th Cir.1990).

*United States v. Paiz,* 905 F.2d 1014, 1020 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991).

The question of whether there is one conspiracy or several is a question of fact for the jury. *Id.* at 1019. Thus we will uphold a conviction if, when viewing the evidence in the light most favorable to the government, "a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *Townsend,* 924 F.2d at 1389. This is so even if the evidence at trial was also consistent with a finding that multiple conspiracies existed. *Id.* In addition, the scope of our review does not permit us to reweigh the evidence or make independent witness credibility determinations. *United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993).

The defendants contend the following: (1) Marren admits to distributing marijuana during the time mentioned in the indictment but claims that he conspired with others—not any members of the Lanier/Kramer group; (2) Smith admits to drug activity in conjunction with Tuchband and Tobias, but claims he failed to join in the "larger conspiracy"; and (3) Louison denies knowingly joining any drug conspiracy, maintaining that he was not aware that marijuana was present in the trucks he drove.

After reviewing the evidence in the light most favorable to the government, we conclude that sufficient evidence exists to convict each defendant of having joined a single conspiracy to distribute Lanier/Kramer marijuana.

*James Marren*

During the mid to late 1970s, James Marren and Michael Canino were partners distributing marijuana in Philadelphia. The Marren/Canino partnership obtained marijuana from various sources. In 1976 or 1977, the two men began obtaining marijuana from Ron Ball, a "major customer" of his brother-in-law, Randy Lanier. At some point, Marren moved to Florida to obtain marijuana more easily; Canino remained in Philadelphia to service their customers. Originally, Marren along with Ball and Jim Blair worked to supply Canino with marijuana. However, in 1980, Ball became convinced that Marren was creating too much exposure for the group by his open discussion of drug deals and by obtaining marijuana from other sources. As a result, a deal was struck whereby Ball could sell marijuana directly to Canino. From then on, Marren was no longer actively involved in the distribution of Lanier marijuana but received a cut of the profit each time Ball made a delivery to Canino. According to several trial witnesses, Marren received commission payments, primarily from Canino, on approximately 150,-000 pounds of marijuana over the next several years. Meanwhile, Marren also procured marijuana from other sources and supplied it to Canino.

Marren argues that this evidence proves only that he was involved in a separate and distinct conspiracy, presumably with Ball, Blair and Canino, prior to 1982. Marren does not dispute that a Lanier/Kramer drug conspiracy existed. Rather, he contends that the evidence did not show that he joined *that* conspiracy. We disagree. Marren introduced Ball, Lanier's brother-in-law and "major customer," to Canino to further the conspiracy's goal of distributing Lanier/Kramer marijuana. *See United States v. Percival,* 756 F.2d 600, 607 (7th Cir.1985) (introduction of drug coconspirators can show intent to join conspiracy). In addition, numerous witnesses testified that once Marren ended his day-to-day participation, he still was aware of the Lanier/Kramer operation's shipments and received $5 for each pound of Lanier/Kramer marijuana sold to Canino by Ball.

We believe that this circumstantial evidence was enough from which the jury could infer that Marren knew of the Lanier/Kramer conspiracy and intended to join it. *See Townsend,* 924 F.2d at 1390 (the key question is "whether the jury may reasonably *infer* a single agreement among the defendants from the evidence ... presented by the government"); *United States v. Penson,* 896 F.2d 1087, 1094 (7th Cir.1990) (government need only show that defendant knew purpose of conspiracy and intended to join it).

Marren also argues that "the government improperly alleged a single conspiracy in this case to take advantage of some of the procedural expediencies referred to by the *Townsend* Court." Having already concluded that a single conspiracy was *proven*, we can only conclude that it was properly alleged. Marren attributes further improprieties to the prosecutor which are not supported by the record and do not merit discussion here.

*Ronald Smith*

■ In 1983, Ron Smith, who owned tractor-trailer trucks, was hired by Tuchband and Tobias, Lanier's "major customers," to retrieve their share of Lanier/Kramer marijuana from a barge in New York and deliver it to their stash houses. Smith coordinated different truckers' efforts and completed the task.

In 1984, 1985 and 1986, Smith again coordinated the unloading and truck delivery of barges of Lanier/Kramer marijuana for Tuchband and Tobias. In addition, Smith also carried drug money back to members of the Lanier/Kramer organization. Smith was paid five to seven dollars for each pound of marijuana hauled—amounts totalling hundreds of thousands of dollars.

Smith concedes that this evidence is sufficient to show that he conspired with Tuchband and Tobias to distribute marijuana, but argues that it is insufficient to prove that he knowingly joined the larger Lanier/Kramer conspiracy. Under *Townsend* and its progeny, Smith's argument must fail. We have repeatedly held that a defendant is part of a conspiracy if mutual dependence or mutual support is shown. *Townsend*, 924 F.2d at 1392. Moreover, if a conspiracy has "a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy." *United States v. Mealy*, 851 F.2d 890, 896 (7th Cir.1988).

We have no trouble concluding that the evidence demonstrated that Smith knowingly joined others, including but not limited to Tuchband and Tobias, in a single conspiracy to distribute Lanier/Kramer marijuana. From 1983 to 1986, every time a barge of Lanier marijuana arrived in this country,

Smith played an active rôle in ensuring that it got from the port to the area where the "major customers" could distribute it. As mentioned, Lanier and Kramer's "major customers" were responsible for picking up their share of marijuana when it arrived. It is hard to conceive of a drug distribution set-up where mutual dependence and support is more apparent. Lanier and Kramer used their connections outside of the United States to obtain marijuana and relied on their "major customers" and their employees to transport it to the market.

Trial testimony revealed that Smith not only was responsible for the transportation of hundreds of thousands of pounds of Lanier/Kramer marijuana, but also acted as a money courier for the Lanier/Kramer group. It is apparent from the record that Smith knew not only whose marijuana he was trucking but also the amounts of marijuana involved. Smith was present at four major shipments and helped Lanier/Kramer representatives unload the barges of marijuana. "[I]f the evidence indicates that a defendant must have known that his actions were benefitting a larger conspiracy, he may be said to have joined the conspiracy." *Townsend*, 924 F.2d at 1390. The jury had ample evidence to support its conclusion that Smith had knowingly joined a single conspiracy to distribute Lanier/Kramer marijuana.

*Gerald Louison*

In 1983, Tuchband and Tobias were concerned that they may need more than Ron Smith's trucks to pick up their share of Lanier/Kramer marijuana. Upon a recommendation from a coconspirator, Eugene Walters, they hired Harley Surratt. Surratt, a trucker who had hauled marijuana in the past, and his brother-in-law, Gerald Louison, helped load boxes of lettuce onto other truckers' tractor-trailers to cover the marijuana, but did not haul any marijuana because the extra trucks were ultimately not necessary. Surratt was paid for making the trucks available to Tuchband and Tobias. Surratt and Louison were able to participate more actively in 1985 and 1986. In each of those years, Louison drove a truckload of marijuana from the barge site to a Lanier/Kramer stash house.

■ At trial and on appeal, Louison claims that he was unaware that he was hauling marijuana and thus he could not have knowingly joined any conspiracy to distribute marijuana, including the Lanier/Kramer conspiracy. We conclude the evidence supports a contrary view—the one the jury embraced when it convicted Louison. As mentioned, witnesses testified that Louison was present at the arrival of three shipments of Lanier/Kramer marijuana and ended up trucking over 65,000 pounds of it across the United States. More than one witness testified that Louison not only loaded trucks but participated in conversations with other marijuana truckers about how best to avoid agricultural road stops. In addition, the record reveals that Lanier/Kramer representatives were present at the barge sites and a representative generally accompanied each truck from the barge to the stash houses.[3]

Almost identical testimony was presented against Surratt at his trial. *Penson*, 896 F.2d at 1093–94. In upholding Surratt's conspiracy conviction, we concluded:

Surratt now asks this Court to believe that he could not recognize marijuana by sight or smell, and in addition that he found nothing unusual about covering an enormous load of unknown material with lettuce. Based on the evidence adduced at trial, it would have been irrational for the jury to have found that Surratt was ignorant of what was going on around him.

*Id.* We fail to see how the evidence presented against Louison is distinguishable. Furthermore, once the jury concluded that Louison had knowingly transported Lanier/Kramer marijuana, it was permissible for it to conclude that he had joined the single conspiracy to distribute. *See Townsend*, 924 F.2d at 1390 (jury is permitted to infer that a defendant joined a *single* conspiracy from circumstantial evidence produced at trial). Like Smith, Louison cannot claim he was unaware of the scope of the conspiracy. He participated in three barge shipments which

contained well over the 1,000 pounds of marijuana alleged in the indictment. Thus, the evidence supports the jury's finding that Louison knowingly joined the Lanier/Kramer conspiracy.

We hold that each defendant has failed to demonstrate that a variance existed between the conspiracy alleged in the indictment and the evidence presented at trial.

*Multiple Conspiracy Instruction*

At trial, the following multiple conspiracy instruction was given to the jury:

You may judge the defendants only on the charges alleged in the indictment. You may not convict them of any other alleged conspiracy in the event you should conclude that they have engaged in some other conspiracy. Therefore, if you are not convinced beyond a reasonable doubt that a particular defendant knowingly and intentionally joined the conspiracy alleged in the indictment, you must find the defendant not guilty.

Even if you find that a particular defendant knowingly and intentionally joined a conspiracy other than that alleged in the indictment, you should nevertheless, find that defendant guilty of the charge alleged in the indictment if you are convinced beyond a reasonable doubt that the defendant knowingly and intentionally joined the single overall conspiracy that is alleged in the indictment and the elements of which are otherwise contained in these instructions.

The defendants argue that the district court erred in giving this instruction for two reasons: (1) the instruction prevented them from presenting their multiple conspiracy theory to the jury; and (2) the instruction did not treat the issue fairly and accurately, but instead served only to confuse the jury.

■ When faced with a challenge to a jury instruction, we examine whether the instructions as a whole treated the issues in

---

**3.** The marijuana was not weighed and packaged at the barge site but, rather, once it arrived at the stash houses throughout the country. To protect themselves from theft, Lanier and Kramer apparently had a "representative" accompany each truck to the stash house in order to oversee the weighing and packaging of the marijuana. Although there was no direct testimony that a Lanier/Kramer representative accompanied Louison, there is nothing to suggest that the organization exempted Louison from its normal practice.

the case fairly and accurately. *United States v. McNeese*, 901 F.2d 585, 607 (7th Cir.1990). As long as jury instructions treat issues fairly and adequately, we will not disturb them on appeal. *United States v. Simone*, 931 F.2d 1186, 1193 (7th Cir.1991). Further, we grant substantial discretion to the trial court concerning the specific wording of instructions. *Penson*, 896 F.2d at 1090.

■ Defendants are entitled to have their theories of defense presented to the jury, but are not entitled to the particular wording of their requested instructions. *United States v. Boucher*, 796 F.2d 972, 976 (7th Cir.1986). "[T]he [trial] court need not give a proposed instruction if the essential points are covered by those given." *Penson*, 896 F.2d at 1090 (citing *United States v. Xheka*, 704 F.2d 974, 987 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983)). According to the defendants, the foregoing instruction did not present their multiple conspiracy theory of defense to the jury. This argument is without merit. Read as a whole, the instruction stresses that the defendants may *only* be convicted for the conspiracy described in the indictment. *See Canino*, 949 F.2d at 940–41 (using a plain error analysis, the court concluded that an identical instruction properly conveyed the defendants' theory of defense); *United States v. Lyons*, 670 F.2d 77, 79 (7th Cir.) (identical instruction held proper), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).[4]

■ Defendants also claim that the instruction confused the jury. At trial, the defendants did not object to the first paragraph of the foregoing instruction, which in fact was their proposed instruction on this issue. Rather, the defendants claim that the government insisted on adding the second paragraph in order to confuse the jury. We fail to see how the second paragraph could confuse the jury; it merely clarifies that although a defendant may have been a member of a different conspiracy, he may still be convicted if the jury finds he was also a member of the conspiracy for which he was indicted. This clarification may have been particularly helpful to the jury in this case, where the defendants were claiming to be members of different conspiracies. We repeat our conclusion in *Canino*: the "instruction was clear and in conformance with the law of this case." 949 F.2d at 941. *See also Lyons*, 670 F.2d at 79 (concluding that the second paragraph appropriately reinforces the first paragraph).

*Severance*

■ The defendants argue that the trial court erred in denying their repeated motions for severance. We are unpersuaded. We begin with the presumption that coconspirators who are indicted together are appropriately tried together. *United States v. Caliendo*, 910 F.2d 429, 437 (7th Cir.1990). Moreover, because the decision to grant severance is soundly within the trial judge's discretion, we will only reverse if the defendant shows " 'actual prejudice'—that is, the defendant must show [ ]he could not possibly have a fair trial without a severance." *Id.*

Actual prejudice may arise if there is a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant, or if there is a gross disparity of evidence between the defendants. *United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir.1985). The defendants seem to claim that both of these situations existed in this case. More specifically, the defendants claim that they were prejudiced by a joint trial since the jury was bombarded with a large amount of evidence regarding the Lanier/Kramer conspiracy which was unrelated to them. Thus, the defendants conclude that they were convicted because evidence that would have been excluded in separate trials was presented during their joint trial.

---

4. Moreover, we note that the court gave specific instructions regarding two of the defendants' theories of defense.

   You are instructed that the Defendant James John Marren's theory of defense is as follows: Although James John Marren engaged in certain conduct which violated federal laws relating to marijuana, he did not join, nor was ever a member of the conspiracy alleged in the Indictment in this case.

   An identical instruction was given regarding Ron Smith.

■ Although it is true that the government presented a large amount of evidence regarding the Lanier/Kramer conspiracy during the trial, we do not believe that this deprived the defendants of a fair trial. Much of the government's evidence was necessary to explain the operations of the Lanier/Kramer group and the defendants' roles within the group, and much of it would have been permissible at separate trials. Moreover, the key question is whether the jury could follow limiting instructions and keep the evidence against each defendant separate. *United States v. Peters,* 791 F.2d 1270, 1302 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). The trial judge gave repeated limiting instructions throughout the trial as well as during the jury charge.[5] We presume that the jury was capable of following the limiting instructions given throughout the trial and reached separate conclusions regarding each defendant. *See United States v. Briscoe,* 896 F.2d 1476, 1517 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

The defendants have given us no reason to question the jury's capacity; this case is not that complicated and the disparity of evidence between defendants is minor. In *Briscoe,* we held that a drug courier was properly tried with fourteen others in a heroin conspiracy case. *Id.* at 1483. In light of that holding, we cannot conclude that those responsible for trucking thousands of pounds of marijuana, Louison and Smith, cannot be jointly tried with one who collected profits on thousands of pounds of marijuana, Marren. Because the defendants have failed to show that they were actually prejudiced by a joint trial, we hold that the district court did not abuse its discretion in denying their severance motions.

*Evidence Admitted Under Federal Rule 404(b)*

■ Both Marren and Louison argue that their convictions must be reversed because the trial court improperly admitted evidence of prior bad acts in violation of FED.R.EVID. 404(b). Our review of the district court's evidentiary rulings is limited to whether the trial court abused its discretion. *United States v. Torres,* 977 F.2d 321, 325 (7th Cir.1992); *United States v. Lennartz,* 948 F.2d 363, 366 (7th Cir.1991).

■ We apply a four-part test and admit Rule 404(b) evidence if:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Penson,* 896 F.2d at 1091. Applying this test to the evidence to which Louison and Marren object, we conclude that the trial court did not abuse its discretion by admitting prior conduct evidence.

*Louison*

■ At trial, Eugene Walters testified that Louison hauled a truckload of marijuana for him in 1982 from Louisiana to Colorado. Louison argues that this testimony does not meet any prong of our four-part test. We disagree.[6]

---

5. At the close of trial, the jury was instructed as follows:

Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him.

In addition, the court gave Louison's instruction: You must give separate consideration to each defendant. You should return a separate verdict as to each defendant. Your verdict of guilty or not guilty as to one defendant should not control your decision as to any other defendant.

6. Louison also argues that Walter's testimony should not have been admitted because the prosecution did not give him adequate pretrial notice. While it is true that Rule 404(b) was amended to require notice, this amendment was not effective until December 1, 1991—long after Louison's trial. *See United States v. Concepcion,* 983 F.2d 369, 393 (2d Cir.1992).

Throughout trial, Louison claimed he was unaware that he had hauled marijuana and thus lacked the specific intent needed to commit the crime of conspiracy. *See United States v. Liefer,* 778 F.2d 1236 (7th Cir.1985) (proof of conspiracy to distribute drugs requires a showing of specific intent); FED. R.EVID. 404(b) (evidence of other wrongs or acts admissible to show proof of intent and knowledge). When a defendant is charged with a specific intent crime, the government may present other acts evidence to prove intent. *Liefer,* 778 F.2d at 1243 (court properly admitted evidence that defendant had "picked up" a previous load of marijuana in a case where the defendant denied ever possessing the marijuana alleged in the conspiracy charge). Therefore, because Walter's testimony was used to establish Louison's knowledge and intent to distribute marijuana and not his propensity to distribute, the first prong of our test is satisfied.

Walter's testimony also meets the second requirement of the test in that the prior act is similar enough and close enough in time to be relevant to the matter at issue. In both instances, Louison was involved with Surratt in hauling tractor-trailer loads of marijuana. Moreover, only two years separated the prior act and the charged acts. *See Kramer,* 955 F.2d at 491 (prior act within two years of charged act satisfied 404(b)); *United States v. O'Brien,* 618 F.2d 1234, 1238 (7th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980) (testimony concerning prior act two years earlier admissible under 404(b)).

As to the third prong, Louison strenuously argues that Walter's testimony is insufficient evidence to support a jury finding that Louison hauled marijuana in 1982. Our previous comments on this prong of the test are instructive:

[this prong] is designed to prevent the jury from exposure to or consideration of evidence that establishes the defendant's participation in the prior crime only by highly circumstantial inferences.

*United States v. Chaimson,* 760 F.2d 798, 807 (7th Cir.1985) (decided when prong required clear and convincing evidence).

In *Chaimson,* we held that direct testimony of a defendant's participation in the prior crime was sufficient to satisfy the now discarded clear and convincing test. *Id.* at 807–08. Hence, under the current standard, we must conclude that uncorroborated direct testimony of an accomplice is sufficient to support a jury's finding unless it is incredible on its face or otherwise insubstantial. *See also United States v. Butler,* 792 F.2d 1528 (11th Cir.), *cert. denied,* 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986).

According to Louison, Walter's testimony was incredible, in part because he did not identify Louison in his initial interview with the FBI and, in part because he was motivated to incriminate Louison in order to receive a more lenient punishment under his plea agreement. We disagree. Walter testified to events which quite possibly occurred and he could have physically observed; his testimony was not incredible as a matter of law. *See United States v. Van Wyhe,* 965 F.2d 528, 531 (7th Cir.1992). Walter's motives for testifying and his allegedly faulty memory were topics on cross-examination which defense counsel thoroughly explored. We believe Walter's testimony meets this prong.

The final element of the test is also met. Walter's testimony was probative on the issue of whether Louison intended to distribute marijuana. "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice...." *Torres,* 977 F.2d at 328. While the testimony created some risk of prejudice, this risk did not outweigh the testimony's particularly probative value. In addition, any prejudice to Louison was not unfair and was limited by the following jury instruction given at the close of trial:

You have heard evidence of acts of each of the defendants other than those charged in the indictment. You may consider this evidence only on the question of that defendant's knowledge and intent. This evidence is to be considered by you only for this limited purpose.[7]

---

**7.** *Defense counsel did not request a limiting instruction at the time of the testimony. Thus we*

*will only reverse for plain error. Liefer,* 778 F.2d *at 1244. There was no plain error here.*

*See United States v. Maholias,* 985 F.2d at 879–80; *Torres,* 977 F.2d at 329.

Louison also complains that the court should not have admitted testimony regarding monetary transactions he conducted with Harley Surratt, Patricia Wilbur, and Norman Louison. The government presented this testimony in order to show that Louison had received a large amount of money for his illegal activities and had tried to conceal its source through a series of complicated transactions. Louison argues that this evidence does not meet Rule 404(b)'s requirements.

■ Federal Rule of Evidence 103(a)(1) requires that a timely *specific* objection be made to preserve an issue for review. *United States v. Field,* 875 F.2d 130, 134 (7th Cir.1989). At trial, Louison's counsel objected to this evidence based on relevancy grounds, not 404(b) grounds. Because Louison did not properly raise a 404(b) objection at trial, he is precluded from raising this issue on appeal absent a showing of plain error. *Id.* We find no plain error here. Louison has failed to demonstrate that but for the admission of this transactional evidence he would have been acquitted. *See id.* at 135. There was ample evidence that Louison joined the conspiracy, absent this testimony. Consequently, we can only conclude that the jury still would have convicted Louison even if it were unaware that Louison actively tried to conceal his drug profit money.

■ Further, we hold that this evidence was admissible under Federal Rules of Evidence 401 and 402. Evidence is relevant if it tends to make any fact at issue more or less probable. FED.R.EVID. 401. Because concealing the source of drug money goes hand and hand with a conspiracy to distribute marijuana, evidence of a defendant's attempts to "launder" money is relevant, and thus admissible to prove the conspiracy. *See United States v. Towers,* 775 F.2d 184, 187 (7th Cir.1985).

We concluded the following in *Towers:*

[W]here a defendant is on trial for a crime in which pecuniary gain is the usual motive for or natural result of its perpetration and there is other evidence of his guilt, evidence of the sudden acquisition or expenditure of large sums of money by the defendant, *at or after the time of the commission of the alleged offense,* is admissible to demonstrate the defendant's illegal obtention of those funds.

775 F.2d at 187–88 (emphasis added). Because the defendant's objection to evidence of the monetary transactions goes to the issue of weight, not admissibility, we hold that the trial court did not abuse its discretion by admitting such evidence. *See id.* at 188.

### *Marren*

■ Marren contends that the trial court erred in permitting various witnesses to testify that he was involved in importing and attempting to distribute a "Jamaican load" of marijuana.[8] Marren argues that the testimony fails to show either his intent or a common scheme because the evidence showed that he was an investor in the "Jamaican load," whereas he was "solely a broker" in the charged conspiracy. This argument is without merit. The fact that Marren's specific role in the two different conspiracies varied in no way detracts from the fact that the testimony showed that Marren *intended* to make money from trafficking in marijuana.

The second prong is satisfied because the bad acts were not only identical, but the "Jamaican load" occurred in 1984—during the time frame of the conspiracy alleged in the indictment. The third part of the test is satisfied in that several witnesses testified about Marren's participation in the "Jamaican load." As we concluded above, as long as direct testimony on the issue is not incredible, the third prong is met. *See Chaimson,* 760 F.2d at 807–08. None of the testimony presented was incredible or otherwise insubstantial.

---

**8.** According to evidence at trial, Marren, Canino and others pooled funds together in 1984 in order to import marijuana from Jamaica. The government conceded that this transaction was not part of the Lanier/Kramer conspiracy but a separate drug conspiracy. Canino and others were charged with conspiracy to import the Jamaican load, but Marren was not.

Finally, we believe that the probative value of evidence concerning the "Jamaican load" was not outweighed by a danger of unfair prejudice. The "Jamaican load" testimony was probative on two key trial issues: the relationship between the coconspirators, and how the testifying witnesses were aware that Marren was receiving profit payments from Canino as well as the flow of those payments. In addition, the danger of unfair prejudice was reduced by the limiting instruction set out above. *Torres*, 977 F.2d at 329. Therefore, we hold the trial court did not abuse its discretion in admitting evidence of Marren's involvement in the 1984 "Jamaican load."

*"Ostrich" and "Mere Presence" Instructions*

Louison argues that the trial court erred in giving the jury a conscious avoidance or "ostrich" instruction because there was no evidence that he consciously avoided knowing that he carried marijuana. According to Louison, the evidence showed that he either knew he was involved in a conspiracy or he did not know, making an "ostrich" instruction inappropriate. Alternatively, Louison contends that once the "ostrich" instruction was given, the court erred in not giving one of his two proposed "mere presence" instructions. After reviewing the record, we conclude that the trial court did not err because the instructions given fairly and accurately framed the issues for the jury.

■ The conscious avoidance instruction was properly given if Louison claimed that he lacked guilty knowledge and if the facts and evidence support an inference that Louison deliberately avoided such knowledge. *See Lennartz*, 948 F.2d at 369. On appeal, we view the facts and evidence in the light most favorable to the government and reverse only if the trial court abused its discretion. *Caliendo*, 910 F.2d at 433–34. "In addition, we do not review instructions in lonely isolation, but rather in the context of the trial as an integrated whole." *United States v. Bigelow*, 914 F.2d 966, 970 (7th Cir.1990), *cert. denied*, 498 U.S. 1121, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991).

The trial court instructed the jury as follows:

Actual knowledge and deliberate avoidance of knowledge are the same thing. Thus, you may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut their eyes for fear of what he or she would learn, you may conclude that the person acted knowingly or with knowledge, as I have used these terms.

We held that an identical instruction was properly given in a factually similar case. *Paiz*, 905 F.2d at 1022. In *Paiz*, two defendants, who had driven marijuana laden vehicles, claimed they were merely "unknowing pawns in the drug transport scheme." *Id.* We concluded that:

[s]uch a scenario, one in which "the defendant acknowledges her association with the group but, despite circumstantial evidence to the contrary, denies knowledge of the group's illegal activity" is a paradigm case for use of the "ostrich" instruction.

*Id.* We fail to perceive how Louison's case is distinguishable.

Although Louison did not testify, his counsel's arguments and cross-examination questions clearly indicate that Louison did not deny that he had driven trucks for members of the Lanier/Kramer conspiracy, but that he did deny knowledge of the marijuana the trucks contained—i.e., "the group's illegal activity."[9] In addition, we find that the evidence identified several circumstances from which the jury could infer that Louison was suspicious, but deliberately refused to inquire. For example, one witness testified that the farm warehouse to which Louison delivered the 1985 load of marijuana was isolated and unlike any place a trucker would deliver legitimate cargo. Another witness testified that Louison helped load lettuce over closed marijuana containers as cover. The jury was entitled to conclude that these situations aroused Louison's suspicions but he chose to remain deliberately ignorant.

---

**9.** In fact, during the jury instruction conference, Louison's counsel admitted to the court that he planned to argue lack of guilty knowledge in his closing argument.

*See also Caliendo,* 910 F.2d at 434; *United States v. Diaz,* 864 F.2d 544, 551 (7th Cir. 1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989).[10]

Further, we reject Louison's alternative argument that once the "ostrich" instruction was given, the trial court was required to give one of Louison's proffered "mere presence" instructions. As mentioned previously, we will not find error when, as a whole, the instructions treat the issues fairly and adequately. *Xheka,* 704 F.2d at 987. Moreover, the trial court is afforded substantial discretion in fashioning the exact language of the instructions. *Penson,* 896 F.2d at 1090.

Along with outlining the elements of conspiracy, the court instructed that "[t]he government must prove beyond a reasonable doubt that he was aware of the common purpose [of the conspiracy] and was a willing participant." Louison's proposed instructions merely restates the same principle in different language. Further, Louison's proposed instruction may have confused the jury since it discussed "presence at the scene of a crime" and Louison was charged with the crime of conspiracy—a crime which may not have a particular "scene." We cannot conclude that the trial court abused its broad discretion by using the foregoing language. *See id.* at 1090–91 (identical jury instruction held to cover essential elements of case, thus no error to omit defendant's proposed mere presence instruction).

### Marren's Sixth Amendment Claims

Marren claims that he was denied his constitutional right to counsel when Stephen Finta was disqualified from representing him during his first "trial," and when William Norris was disqualified from assisting Marren's defense in his second trial. We have previously held that Mr. Finta was properly disqualified in Marren's first trial and will not revisit that issue. *See Marren,* 919 F.2d at 61.[11] Additionally, we conclude that Mr. Norris was properly disqualified from Marren's second trial.

Five days into trial, Mr. Norris entered an appearance. Apparently, Mr. Norris desired to assist Christopher Heid, Marren's court appointed attorney. The government moved to disqualify Mr. Norris, former Chief of the Narcotics and Dangerous Drugs Section of the United States Attorney's Office for the Southern District of Florida, claiming that he supervised and had substantial involvement in a parallel investigation concerning the Lanier/Kramer conspiracy.

Without objection, an *in camera* hearing was held. At its conclusion, the trial judge disqualified Mr. Norris under the court's inherent authority to supervise the professional conduct of attorneys appearing before it and pursuant to the Illinois Rules of Professional Conduct. Rule 1.11(a) prohibits an attorney from representing "a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government consents after disclosure."

We review the trial court's decision to disqualify Mr. Norris only for abuse of discretion. *United States v. Defazio,* 899 F.2d 626, 629 (7th Cir.1990). All factual findings relied upon by the trial judge will be upheld unless they are clearly erroneous. *Id.* The transcript of the *in camera* pro-

---

**10.** Moreover, we note that the trial court gave another instruction regarding knowledge requested by Louison:

When the word "knowingly" is used in these instruction[s], it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident.

Though not essential to our holding, the fact that this instruction was given supports our determination that the trial court did not abuse its discretion.

**11.** Marren claims that the prosecution somehow violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct.

1194, 10 L.Ed.2d 215 (1963), by suppressing evidence in the time period between the first and second indictments. Specifically, Marren points to the fact that the indictment for his second trial alleged that the conspiracy existed from 1978–1987, while the first indictment alleged the existence of a 1980–1987 conspiracy. Although it is clear that the government did push back the dates in the second indictment, we fail to see how this action constitutes suppressing evidence in violation of *Brady.* Moreover, it is certainly irrelevant to whether Marren was denied his right to counsel.

ceeding held by Judge Foreman reveals that Mr. Norris was the immediate supervisor of the attorney in charge of an investigation in South Florida which was intertwined with the investigation and prosecution of Marren. In addition to his supervisory responsibilities, Mr. Norris signed an immunity agreement for one of the government's major witnesses in this case and attended high level department meetings regarding the two investigations.[12]

We believe these facts were sufficient to allow Judge Foreman to conclude that Mr. Norris had substantial involvement with the investigation and thus presume that Mr. Norris received confidential information. *See La Salle National Bank v. County of Lake,* 703 F.2d 252, 255–56 (7th Cir.1983) (once substantial relationship established, court may presume confidential information was received). Further, although this presumption is rebuttable, Mr. Norris did not "clearly and persuasively show that he was not privy to the confidences and secrets of the client...." *Id.* at 257.

As a result, we have no problem concluding that the trial court did not abuse its discretion when it disqualified Mr. Norris for his prior government involvement in matters closely connected to Marren's case. It follows that the presumption in favor of permitting Marren to choose Mr. Norris was overcome by concerns for the integrity of the judicial process and that Marren's Sixth Amendment right to counsel was not violated. *Wheat v. United States,* 486 U.S. 153, 158–59, 108 S.Ct. 1692, 1696–97, 100 L.Ed.2d 140 (1988) (defendant may not insist on an attorney "who has a previous or ongoing relationship with the opposing party, even when the opposing party is the Government").

*Marren's Fair Trial and Mistrial Claims*

■ Marren further argues that the government violated his right to a fair trial by refusing to grant immunity to various witnesses. Because Marren's conclusory allegations do not convince us that the prosecutor abused his discretion or intentionally distort-

ed the judicial fact finding process, this argument must fail. *See United States v. Hooks,* 848 F.2d 785, 799 (7th Cir.1988); *United States v. Frans,* 697 F.2d 188, 191 (7th Cir.), *cert. denied,* 464 U.S. 828, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983).

■ Similarly without merit is Marren's claim that the prosecutor's mistaken mention of a nonexistent 1979 marijuana conviction during closing argument required a mistrial. Given that Marren's counsel freely admitted Marren's involvement in marijuana activity, the context of the whole trial, and the judge's curative instruction, we conclude that the trial court did not abuse its discretion by denying Marren's mistrial motion. *See United States v. Tanner,* 941 F.2d 574, 585 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992); *United States v. Mealy,* 851 F.2d 890, 902 (7th Cir. 1988).

*Ex Post Facto*

Finally, Marren and Smith attack the validity of their sentences, claiming that they violate the Ex Post Facto Clause of the United States Constitution.

Prior to October 27, 1986, a defendant convicted of an offense involving over 1000 pounds of marijuana could not be sentenced to a term of more than fifteen years in prison. 21 U.S.C. § 841(b)(6) (1984), *amended by* 21 U.S.C. § 841(b)(1)(B) (Supp.1992). However, the Anti–Drug Abuse Act of 1986 increased the penalty for such defendants to permit a term of 15 to 40 years imprisonment. 21 U.S.C. § 841(b)(1)(B) (Supp.1992).

■ To avoid an ex post facto violation in an enhanced penalty situation

[t]he government need not prove the defendant's involvement after the effective date of the enhanced penalty provision. The government must only prove that the defendant was involved in the conspiracy and that the conspiracy continued past that date.

granted immunity testified.

12. In fact, Mr. Norris did not enter his appearance until after the witness to whom Norris had

*Canino,* 949 F.2d at 952. As described above, the government proved that Smith and Marren were members of the Lanier/Kramer conspiracy. In addition, the government proved that the conspiracy continued beyond October 1986.

A defendant may avoid the enhanced penalty if he carries the burden of proving that he withdrew from the conspiracy prior to the effective date of the penalty enhancement. *Id.* Smith does not contend, nor could he, that he withdrew from the conspiracy. However, Marren argues that he did. According to Marren, he "withdrew" no less than three times: (1) in 1980 when he "stopped affiliating" with Ron Ball and others, (2) in 1981 or 1982 when he was arrested, and (3) in 1984 when he provided legal authorities "with information tantamount to a withdrawal."

■ To effectively withdraw from a conspiracy, a defendant must do more than cease his activity. *United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). "[T]here must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment, in a manner calculated to reach co-conspirators." *Id.* None of Marren's "withdrawals" meet this standard. First, ceasing to affiliate with members of the conspiracy is not enough. Second, Marren's arrests in 1981 and 1982 are not sufficient because he continued to receive payments on Lanier/Kramer marijuana until 1986. Third, there is no evidence in the record that Marren made a clean breast with authorities in 1984; Marren's conclusory assertion to this effect is not persuasive.

In summary, Marren's withdrawal arguments all fail for the same simple reason: evidence at trial demonstrated that Marren was still accepting cash payments for Lanier/Kramer marijuana sold in 1986—long after his alleged "withdrawals" occurred.

*Conclusion*

For the foregoing reasons, we AFFIRM the convictions and sentences of Ronald J. Smith, James J. Marren and Gerald T. Louison.