**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Victor M. RIVERA and Mario Heredia, aka "Nacho," Defendants– Appellants.**

**Nos. 92–4009, 93–1006.**

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1993.

Decided Sept. 22, 1993.

William J. Lipscomb, Milwaukee, WI (argued), for U.S.

Peter Kafkas, Wauwatosa, WI (argued), for Victor M. Rivera.

John Miller Carroll, Milwaukee, WI (argued), for Mario Heredia.

Before CUMMINGS, FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This drug conspiracy case raises two distinctive issues, among others, for our review: (1) whether the district court abused its discretion by refusing to order the government to disclose one defendant's plea negotiation statement to his codefendant; and (2) whether currency seized from members of a drug conspiracy can be converted to its drug equivalent and used to calculate a defendant's base offense level for sentencing purposes. We answer these questions no and yes, respectively. Further, we find the defendants' other challenges unpersuasive and affirm both defendants' convictions and defendant Rivera's sentence.

## I. Facts

Accepting the evidence in the light most favorable to the government as we must, Victor Rivera and Mario Heredia were members of a drug conspiracy which transported cocaine from the Los Angeles area to the country's midsection. Rivera and Jesus Estrada were the organizers of the Los Angeles supply end and Jose Castellanos ran the distribution end in the midwest. The organization operated from late 1990 into the spring of 1991. Initially, the group distributed cocaine in Sioux City, Iowa. The Los Angeles members of the conspiracy brought cocaine to Castellanos who lived in Sioux City for a period of time. Rivera personally made the last delivery of a kilogram of cocaine in January 1991.

Due to arrests in Sioux City, however, the group moved their distribution base to Milwaukee, Wisconsin, around January 1991. Estrada and Rivera stayed in Los Angeles and Castellanos moved to Milwaukee. At least 2 kilograms of cocaine, though arguably substantially more, were delivered to Milwaukee during the early months of 1991. Things fell apart when the group arranged to deliver eight kilograms of cocaine from Los Angeles to Milwaukee in the spring of 1991.

On May 3, 1991, Moises Rodriquez, Arnolo Padilla, Jesus Estrada, Rivera and Heredia all met at Rivera's tire shop in Los Angeles. At the shop, Estrada and Heredia loaded Rivera's Plymouth Voyager van with cocaine. Rodriquez testified that he saw two of the eight kilograms of cocaine packed into the tailgate of the van. The following day, Rodriquez and Padilla took off for Milwaukee, via Utah, in the van. They did not get too far; outside of Nehi, Utah, on Interstate 15, the van was stopped for speeding. Because the van registration, which listed the owner as Noel Reyes,[1] did not match the information provided by Rodriquez and Padilla, the arresting officer, Utah State Trooper Bushnell, requested and received consent to search the van. Under the tailgate door panel, the officer found two kilograms of cocaine, wrapped in packages marked "DELICADO."

Rodriquez and Padilla were arrested. In addition to the cocaine, the van contained a map of the United States with a route marked off across Utah, through Iowa, to Milwaukee. The van was impounded by the Juab County, Utah, Sheriff.

Rodriquez called Estrada and indicated in code that "two of the apparatus were taken in, but the other apparatus [were] still in the van." In response to this news, Rivera enlisted the aid of attorney Jack Janofsky, who prepared a letter to Juab County authorities which stated that the van's owner, Noel Reyes, authorized the release of the van to Heredia. In addition, Rivera posted bond to secure the release of the two drug couriers.

Rivera and Heredia then set out from Los Angeles in Heredia's car to retrieve the van. When they reached the Sheriff's office on May 15, 1991, Heredia went in alone and recovered the van without difficulty. Both men proceeded to drive to Milwaukee; Heredia drove the van and Rivera drove Heredia's car. In Milwaukee, two men, Castellanos and Gonzalez, were responsible for distributing the organization's cocaine. From May 16 to May 18, calls were made from Utah and

---

1. While the van was registered to Noel Reyes, Rivera apparently admitted that he had taken over the payments on the van and considered it his.

points between Utah and Milwaukee to Castellanos' residence. Castellanos' live-in girlfriend, Rosa Ibanez, testified that these calls were placed by Rivera.

According to Gonzalez's live-in girlfriend, Norma Garza, Gonzalez and Castellanos were present at Gonzalez's apartment on the morning of May 18, when Rivera and Heredia arrived. Garza further testified that while Rivera and Heredia sat at the kitchen table, Gonzalez and Castellanos went to the basement and brought up a cooler containing six kilograms of cocaine. One kilogram was opened for testing. Later in the day, Ibanez arrived and overheard the four men discussing their cocaine business—including the recent arrest of the drug couriers in Utah. The men then left and went to a bar. When they returned, Ibanez heard Rivera arguing with Castellanos about not receiving enough money. Shortly thereafter, Ibanez saw three kilograms of cocaine, two of which Castellanos took back to their residence.

Three days later, on May 21, DEA Task Force Officer Charles Unger searched the garbage behind Castellanos' building and found four empty kilogram wrappers marked "DELICADO." Armed with the wrappers, Officer Unger obtained a search warrant for Castellanos' residence. On May 23, 1992, officers raided the residence, arresting Ibanez and Castellanos as they left in their car. In the automobile, agents found an Express Mail package addressed to Jesus Estrada in Los Angeles. The package contained $39,800 in cash. In the residence, agents found a kilogram of cocaine, an additional kilogram wrapper, $50,000 cash, notebooks, address books, and a large number of Western Union and Express Mail receipts.

The Western Union receipts showed that Castellanos wired $7,000 directly to Rivera on February 14, 1991 and $2000 on February 26, 1991. The receipts also showed that a total of $300,000 had been sent to Los Angeles conspirators, primarily Estrada, from the Milwaukee players. The address books contained phone numbers for Jesus Estrada, Victor Rivera, and for Castellanos in Sioux City, Iowa. A notepad included a ledger listing of funds received by Castellanos, Je-

sus Estrada and Rivera. These documents were identified by Ibanez during trial.

After searching Castellanos' residence, the agents moved to Gonzalez's apartment. In the driveway, they discovered Rivera's Plymouth van. Inside the van, agents discovered numerous documents reflecting the business activities of Rivera and Jesus Estrada. Agents also found an envelope addressed to Rivera which contained the letter drafted by Janofsky authorizing Utah authorities to release the van to Heredia. The van also contained a map with a route outlined from Los Angeles through Utah to Milwaukee.

Rivera was arrested at his tire shop in Los Angeles on November 4, 1991. A search of his office turned up the following items: real estate records describing properties jointly owned by Rivera and Jesus Estrada, documents showing that Rivera had posted bail for Padilla and Rodriquez in Utah, legal bills from Janofsky for the "Utah case," an address book which contained Castellanos' Milwaukee and Sioux City numbers, Castellanos' pager number and "Nacho's" pager number. Agents traced the pager number back to Heredia, and he was arrested on December 4, 1991. Following his arrest, Heredia stated that for $1000 he had driven the van from Utah to Milwaukee at the direction of Jesus Estrada.

In December 1991, Rivera and Heredia were indicted, along with several other individuals, by a federal grand jury sitting in the Eastern District of Wisconsin, on one count of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Estrada, Castellanos and Gonzalez were fugitives at the time of trial. Ibanez, Garza, Rodriquez and Lomelio–Perez agreed to cooperate with the government. Consequently, in February 1992, it appeared that only Rivera, Padilla, and Heredia would go to trial.

On February 24, 1992, Rivera filed a motion to sever his trial from both of his codefendants. The district court granted the motion as to Padilla, but denied (without prejudice) the motion as to Heredia. The basis for Rivera's motion regarding Heredia was that the two men would be presenting mutually antagonistic defenses at trial. In other

words, Rivera's defense was to blame Heredia and Heredia's defense was to blame Rivera. Heredia did not file a motion for severance prior to trial. He did file three discovery motions requesting relevant material from the government.

A jury trial was scheduled for May 18, 1992. It was subsequently reset for June 22, 1992. A change of plea was then set for Rivera on May 18, 1992. On May 23, 1992, Rivera and his attorney met with an assistant United States Attorney. The discussions were memorialized in a document entitled "Debriefing of Victor Rivera."[2] This memorandum was eventually given to Rivera's attorney but not to Heredia's counsel. Apparently, negotiations with Rivera were unsuccessful; Rivera never entered a plea. Instead, he renewed his motion for severance and while the motion again cited mutually antagonistic defenses, Rivera's motion did not mention the document generated by the discussions he had had with the government.

Rivera and Heredia went to trial on August 10, 1992. At the close of the government's case, both defendants' motions for acquittal were denied. Heredia took the stand and testified that he did not know the van contained cocaine and that he had gone to Utah to pick up the van as a favor for Rivera, who claimed the van had been stolen and promised to pay him $1000. He further testified that he received $200 before leaving California to cover his expenses. Heredia stated that once in Utah, Rivera told him to drive the van to Milwaukee for repair work and its subsequent sale.

Heredia admitted that he called a Milwaukee number while in Utah and someone there wired him money for repairs the van needed to make the trip to Milwaukee. According to Heredia, once he arrived in Milwaukee, he called the number again from a K–Mart parking lot off the highway. He was told to wait, and after a half an hour Rivera and another man arrived, took the keys to the van, gave Heredia back his keys and paid him $300. Heredia then stayed at a nearby hotel overnight and went back to California in his car alone.

After Heredia rested his case, Rivera testified in his own defense. He claimed that he did not know cocaine had been loaded into his van at his tire shop and that Jesus Estrada had stolen his van. He testified that Estrada and Janofsky had sent Heredia to him to help him get his van back. Rivera stated that during the trip to Utah, Heredia had told him that there was probably cocaine in the van, but that he did not believe it because he knew the police had already searched the van and removed some cocaine. According to Rivera, he expected to drive the van back to Los Angeles, but after they picked up the van, the two men drove to a nearby restaurant where Heredia called Estrada. After the call, Heredia told Rivera that, whether he liked it or not, the van was going to Milwaukee and took off. Rivera stated that he called Castellanos in Milwaukee at that time because Heredia had thrown him the number before leaving in the van. Rivera further stated that he decided to go to Milwaukee because he had been planning a trip to New York and thought he would go via Milwaukee and try to retrieve his van.

At this point in Rivera's testimony, his counsel requested a recess and informed the court and counsel that he thought he might have an ethical problem because Rivera's testimony was inconsistent with what he had told the government during the debriefing. During this in-chambers meeting, Heredia's counsel requested a copy of Rivera's debriefing statement. Rivera's counsel refused. The government took the position that the document was protected because it had been made during plea negotiations. Rivera's counsel then stated that he would ask his client if he would waive any rights and allow Heredia to have a copy of the statement. The district court approved that plan.

The in-chambers conference took place late on Friday afternoon. Rivera's counsel consulted with his client over the weekend and gave a copy of the statement to Heredia's attorney on Monday morning. Rivera, continuing his direct testimony when the trial was resumed, stated that Estrada and Heredia had taken his van to Downey, California and loaded it with cocaine—prior to the ar-

---

**2.** The memorandum was written by DEA Officer Unger and addressed to AUSA Lipscomb.

rest of the couriers. He further admitted that he had posted $50,000 to bail out the two couriers. However, Rivera claimed that he thought he could not retrieve his $7000 van unless he bailed out the two men who helped steal his van. Returning to the topic of the trip with Heredia, Rivera testified that after Heredia called Estrada from the restaurant, Heredia told him that Estrada would give him a car worth $2500 if he kept his mouth shut. He admitted that he had stayed with Castellanos and Gonzalez in Milwaukee and seen both a gram of cocaine and Heredia at Gonzalez's apartment. He stated that he also saw a cooler but could not see what was in it. Rivera also admitted to arguing with Gonzalez. According to Rivera, he did not want to drive the van back to California, having decided to abandon it because he now suspected it was used to carry drugs. Gonzalez, however, wanted Rivera to take the van.

After this heated discussion, Heredia and Rivera spent the night on couches in the apartment. The following day, an associate of Castellanos arrived and paid Heredia $4000 and Rivera $100. Rivera also stated that he simply left his van in Milwaukee and returned to California; later, Jesus Estrada gave him a car worth $2500.

During a recess shortly before Rivera finished his direct testimony, his counsel renewed his motion for severance based on mutually antagonistic defenses; he also moved for a mistrial. This colloquy followed:

> THE COURT: Government, do you want to respond or not?
>
> MR. LIPSCOMB: No, judge, I don't believe they are mutually antagonistic, the problem here appears to me that they are both not telling the truth.
>
> THE COURT: Mr. Carroll [Heredia's counsel], do you want to say anything?
>
> MR. CARROLL: Your Honor, I would agree they are antagonistic, however, they didn't, I requested in my discovery demand, which I renewed on July 31st of any statements in the possession of the government, which would be inconsistent

with my client's statement. I have received that now. I don't really believe its inconsistent either. Its, on its face, it appears to be, but I think we can proceed.

The court denied both motions, concluding that fingerpointing did not provide a basis for a mistrial. At the close of Rivera's case, both defendants again moved for a mistrial based on inconsistent defenses. The district court denied both motions. On August 17, 1992, the jury found both defendants guilty.

The defendants offer various reasons why their convictions must be reversed, none of which are convincing. Rivera also unsuccessfully challenges his sentence.

## II. Severance

■ Both defendants argue that the district court erred by refusing to sever their cases because they planned to present and did present mutually antagonistic defenses.[3] As the foregoing description makes clear, the defendants did blame one another. Both claimed that they knew nothing of the cocaine and that the other must have been responsible. The severance decision is left to the sound discretion of the district court. *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *United States v. Clark*, 989 F.2d 1490, 1499 (7th Cir.1993); *United States v. Goines*, 988 F.2d 750, 781 (7th Cir.1993), *petition for cert. filed*, July 22, 1993. We conclude that under *Zafiro*, the defendants were not entitled to separate trials and the district court did not abuse its discretion by failing to grant a severance.

■ Joint trials generally are preferred in the federal system. Absent government overreaching, "[t]he joint trial gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.), *cert. denied*, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987). Mutually antagonistic defenses do not automatically result in severance. *Zafi-*

---

**3.** The government contends that defendant Heredia waived the issue by failing to raise it in a timely manner. Although it is true that both counsel used "inartful language," we believe both defendants adequately preserved the issue for our review.

ro, —— U.S. at ——, 113 S.Ct. at 938. A severance is appropriate only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants," or the jury would be unable to reach a reliable verdict. *Id.* "Simple blame-shifting does not necessarily 'prevent a jury from making a reliable judgment about guilt or innocence.'" *Goines,* 988 F.2d at 781 (quoting *Zafiro*).

In this case, all we have is plain and simple blame-shifting. In fact, the relevant facts are essentially indistinguishable from those in *Zafiro.* In *Zafiro,* Garcia and Soto put a box containing 55 pounds of cocaine in Soto's car, drove it to Zafiro's apartment and carried it up the stairs. At trial, Soto testified that he simply gave Garcia a box per Garcia's request and that he did not know cocaine was in the box until their arrests. *Id.* at ——, 113 S.Ct. at 936. Garcia proclaimed innocence, claiming that the box was Soto's and he [Garcia] did not know its contents. *Id.* Similarly, Heredia claims that he was ignorant of the cocaine and Rivera must be responsible; Rivera argues the same with respect to Heredia. In such situations, the Supreme Court has indicated that a severance is not required; rather, "less drastic measures, such as limiting instructions, will often suffice to cure any risk." *Id.* at ——– ——, 113 S.Ct. at 938–39.

In the case at bar, the jury received the same basic instructions given in *Zafiro. Id.* at ——, 113 S.Ct. at 939. The jurors were told to give separate consideration to each defendant [4] and that the government had the burden of proving each defendant guilty beyond a reasonable doubt.[5] Applying the most fundamental presumption, we presume the jury followed these instructions, *id.,* which we are convinced were sufficient to cure any potential prejudice from antagonistic defenses.

Notably, neither defendant on appeal mentions, much less distinguishes, *Zafiro.* Instead, Heredia states only that the district court's failure to sever was an abuse of discretion. Rivera does claim that "Heredia's defense lead to an unjustifiable inference of Mr. Rivera's guilt." The crux of Heredia's defense was he did not know about the cocaine, so Rivera must have. Rivera was free to show that he did not know about the cocaine, either blaming Estrada or Heredia or several others—which he essentially did. Heredia's defense led to a *justifiable* inference of Rivera's guilt, as did the testimony of the government's witnesses.

Rivera complains, however, that "primary evidence" against him came from Heredia. Even assuming this characterization of the evidence is correct, Rivera ignores the fact that Heredia could have testified against him in a separate trial producing the same result. "[W]e see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." *Zafiro,* —— U.S. at ——, 113 S.Ct. at 938.

Rivera also argues that he should have had a separate trial because it was impossible for the jury to acquit both defendants. Specifically, Rivera claims that if the jury accepted Heredia's defense it would have to convict him. This is not true. Heredia claimed that

---

4. The district judge gave two instructions on this issue during his charge:

Although the defendants are being tried jointly, you must give separate consideration to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him.
Where two or more persons are charged with the commission of a crime, the guilt of one defendant may be established without proof that each of the defendants performed every act constituting the crime charged. However, you must give separate consideration to each individual defendant, and to each separate charge against him. Each defendant is enti-

tled to have his case determined from his own conduct and from the evidence which may be applicable to him.

5. The district court charged:

The defendant is presumed innocent of the charge. This applies, of course, to both defendants. This presumption remains with the defendants throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt, that the given defendant is guilty. The government has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the government throughout the case.

he knew nothing about the cocaine. The jury could accept that position and also conclude that Rivera knew nothing about the cocaine as well. For example, the jury could have concluded that Estrada and the previously arrested drug couriers engineered the whole transaction. *See Goines,* 988 F.2d at 781.

Neither defendant has demonstrated that he was the victim of "legally cognizable prejudice"; the district court did not abuse its discretion in denying their severance motions. *Zafiro,* —— U.S. at ——, 113 S.Ct. at 939.

### III. Pre–Trial Discovery

■ Heredia argues that a serious and prejudicial error occurred during pre-trial discovery in this case. Specifically, Heredia contends that the district court should have ordered the government to give him a copy of Rivera's debriefing statement because he had filed motions to discover relevant material possessed by the government. According to Heredia, the district court's refusal to do so prejudiced him in two ways: (1) he did not move for severance earlier in the case; and (2) he did not have adequate time to prepare for cross-examination of Rivera.

Underlying Heredia's argument is the assumption that Rivera's statement was subject to mandatory discovery. However, we are not convinced that this assumption is accurate. Heredia concedes that Federal Rule of Criminal Procedure 16 does not require the government to disclose statements of codefendants.[6] *See United States v. Disston,* 612 F.2d 1035, 1037 (7th Cir.1980). See also 2 WAYNE R. LaFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 19.3(c) (1984). However, Heredia argues that such disclosure is required by the American Bar Association Standards for Discovery and Procedure Before Trial, the Uniform Rules of Criminal Procedure, the National Advisory Commis-

sion Standards and the National Prosecution Standards. The short and conclusive answer to this argument is that none of these sources carry legal weight. These statements have not been legislated by Congress, nor have the federal courts endorsed or adopted them by case law.

■ Our rule is not that disclosure of codefendants' statements is mandatory. Rather, the question of whether the government must produce a codefendant's statement wisely is left to the sound discretion of the district judge. *Disston,* 612 F.2d at 1038; *United States v. Zarattini,* 552 F.2d 753, 758 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977); *United States v. McMillen,* 489 F.2d 229, 231 (7th Cir.), *cert. denied,* 410 U.S. 955, 93 S.Ct. 1420, 35 L.Ed.2d 687 (1973).[7] Further, the defendant must ask for his codefendant's statement before the district court is placed in a position to exercise its discretion. Therefore, we must first determine if and when Heredia asked for production of Rivera's debriefing statement.

Heredia's counsel, in a journeyman's exercise, filed three discovery motions. The first motion requested discovery of various items, repeating the language of Rule 16. The second requested discovery of exculpatory material covered by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The final motion requested an order compelling the government to reveal any agreement entered into between the government and any prosecution witness that could conceivably influence the witness' testimony. Heredia now reads these three motions to encompass a request for Rivera's debriefing statement. He claims he could not have requested it more specifically because prior to the meeting in chambers during trial he was not aware the statement existed.

---

**6.** Rule 16 outlines what the government must disclose to a defendant. While it mentions several items, including statements made by a defendant, it makes no mention of codefendants' statements.

**7.** Of course, the district court's discretion is limited by the Jencks Act. 18 U.S.C. § 3500. Under that statute, if the codefendant is a prospec-

tive government witness, the district court cannot require the government to disclose a codefendant's statement to other defendants until after the codefendant's direct examination. Both parties agree that the Jencks Act does not apply here because Rivera was never a prospective government witness.

To the contrary, none of Heredia's motions can fairly be read to ask for Rivera's debriefing statement. Rule 16, as mentioned before, contains no discussion of codefendants' statements; thus Heredia's first motion is insufficient. As to the second motion, Rivera's statement did not contain evidence exculpating Heredia; rather it contained statements inculpating Heredia. As a result, Heredia's *Brady* motion cannot be read to ask for Rivera's statement. Heredia's third motion does not meet his ex post facto claim because it requested information about deals with government witnesses; Rivera was not a government witness, and he did not have a plea agreement.

Heredia's claim that he could not have been more specific fails as well. While we understand that Heredia did not know that Rivera's debriefing statement existed, he could have filed a motion requesting any statements made by codefendants. Such a motion would have covered any existing documents, including Rivera's debriefing statement. Our conclusion is supported by our previous decisions on this issue. In every case the defendants specifically requested *codefendants'* statements. *Disston*, 612 F.2d at 1034 (defendant requested "a report of statements of co-defendant Camp"); *Zarattini*, 552 F.2d at 757 (defendant requested a transcript of codefendant's grand jury testimony); *McMillen*, 489 F.2d at 229 (defendant Siegel asked for "'[s]tatements of all defendants which mention Robert Siegel in connection with this case....'").[8]

Heredia did unequivocally request a copy of Rivera's statement during the Friday afternoon meeting in the judge's chambers.[9] The district judge refused to compel either Rivera's attorney or the government to provide Heredia's counsel with the statement. Was this an abuse of discretion? The exact basis for the district court's decision is not immediately apparent from the discussion in chambers. However, the district court's reasoning was elaborated in its opinion denying Heredia's subsequent mistrial motion on the issue.

The district court reasoned that the government did not commit misconduct by failing to disclose the statement because: (1) the Jencks Act did not apply—i.e., Rivera was not a government witness, thus the government did not have to disclose his statement; (2) even if the Jencks Act applied, the government had complied with it because Heredia was given the statement after Rivera's direct examination; and (3) the statement was not discoverable because it was made pursuant to a plea negotiation under Federal Rule of Criminal Procedure 11(e)(6).

■ The district court correctly concluded that the Jencks Act did not require the government to produce Rivera's statement. *Disston*, 612 F.2d at 1038. However, we reach a different conclusion from the district court with regard to Rule 11(e)(6). Rule 11(e)(6) prevents statements made by defendants during plea negotiations from being admitted *against them* in civil or criminal proceedings.[10] But Rule 11(e)(6) does not prohibit the disclosure of plea negotiation statements, only their use as evidence against a defendant. Thus, nothing prevented the government from providing a copy of Rivera's debriefing statement to Heredia's counsel to use in seeking a severance.

Our conclusion regarding Rule 11, however, does not mean that the district court abused its discretion in this case. Implicit in the district court's decision not to require

---

**8.** Heredia points out that the U.S. Attorney's office for the Eastern District of Wisconsin operated under an "open file" policy; however, he does not explain how that relieved him of his obligation to submit at least an initial request for codefendants' statements.

**9.** We reject the government's claim that because Heredia did not file a motion to compel, he waived the issue. Heredia's counsel made repeated requests for the document and counsel engaged in an extensive discussion of the issue with the district judge.

**10.** Specifically, Rule 11(e)(6) provides, in part:

> Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
>     *     *     *     *     *     *
>
> (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

disclosure of the statement is a presumption that the defendant must be able to refer to an appropriate legal authority for his position that he is entitled to a particular document. The Jencks Act did not compel the government to produce the document, and Heredia failed to provide any other authority for his contention that the government must hand over Rivera's statement.[11] Given these circumstances, we cannot say the district court abused its discretion when it declined to order the government to produce Rivera's statement. *Accord United States v. Tarantino,* 846 F.2d 1384, 1418 (D.C.Cir.) (declining to require discovery of coconspirator statement absent Constitutional or statutory authority and citing cases in agreement), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988).

Heredia disputes the validity of the foregoing presumption. He contends that the presumption should be that all relevant documents are discoverable unless the government demonstrates that they are protected.[12] Thus, Heredia reasons that the district court did abuse its discretion when it failed to compel production for an erroneous reason. To bolster his argument, Heredia points to the Jencks Act and posits that the Jencks Act limits the general rule of broad disclosure. While it is true that the Act limits the government's duty to disclose, Heredia's position does not acknowledge Rule 16 and pertinent case law.

"The Government is, of course, under 'no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor.'" *Disston,* 612 F.2d at 1037 (quoting *United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)). However, Congress has decided that expanded pre-trial discovery in a criminal case carries certain benefits. As a result, we have Rule 16, which carefully delineates what materials are discoverable by both a criminal defendant and the government. The Advisory Notes to the rule make it clear that Congress examined competing policies and drew lines which attempted to accommodate all relevant concerns. FED.R.CRIM.P. 16 advisory committee's notes. If Congress wanted to require disclosure of statements by non-government witness codefendants, it could have done so. It has not. Therefore, we believe the presumption that, absent some specified requirement, the defendant is not entitled to disclosure is the correct one. The district judge relied on this presumption when he refused to order production; he did not abuse his discretion in doing so.

■ Even if we concluded that the district court erred, Heredia would still lose because he was not prejudiced. His contention that prejudice resulted because he did not file for severance earlier fails in light of our conclusion that the district court properly denied his codefendant's severance motion filed before trial.[13] Moreover, we note that even after he had seen the statement, Heredia's counsel did not move for severance. It was not until after Rivera rested that Heredia's counsel even mentioned severance.[14] As for Heredia's contention that he was ill prepared for cross-examination, the record belies such an assertion. First, we point out that, once he was given the document on Monday morning, Heredia could have requested a continuance in order to prepare for

---

11. During the conference in chambers, Heredia's counsel merely asserted, without support, that he was entitled to anything that implicated his client.

12. Heredia's position is not without some support. *See United States v. Alex,* 788 F.Supp. 1013, 1016 (N.D.Ill.1992) ("The government has offered no compelling explanation for not tendering [the codefendant's] statements to Alex. Therefore, this court will exercise its discretion and order the government to tender the statements.") *But see United States v. Lov–It Creamery, Inc.,* 704 F.Supp. 1532, 1554 (E.D.Wis.1989) (refusing to order the disclosure of coconspirator statements "since the only argument defendant put forth for the need for such statements is to avoid unnecessary surprise and delay, which would be present in every case"), *modified on other grounds,* 895 F.2d 410 (7th Cir.1990).

13. We note that Heredia fails to offer any explanation of how he was prejudiced by a joint trial. A conclusory allegation is wholly insufficient to support such an argument.

14. Indeed, when Rivera's counsel moved for severance shortly before the conclusion of Rivera's direct testimony, Heredia's counsel said he thought they could proceed with a joint trial.

cross-examining Rivera; he did not. Second, the record of the cross-examination reveals that Heredia's counsel skillfully impeached Rivera's story in several ways. Heredia has not suggested to this court any particular area he missed or would have handled differently had he received Rivera's statement earlier. Heredia's defense was not prejudiced by the later disclosure.

## IV. Rule 404(b) Evidence

Both defendants claim that the introduction of prior bad act evidence tainted their trial to such an extent that reversal is required. We address each defendant's claim separately although we reach the same conclusion: the convictions stand.

### Rivera

After extensive discussion about the requirements of Federal Rule of Evidence 404(b), the district court permitted Officer Louis Perez of the Inglewood, California Police Department to testify. Officer Perez stated that he had made three undercover purchases of cocaine from Jesus Estrada on property leased by Rivera, approximately six months before the charged conspiracy began. He further testified that on one of those occasions, Rivera was sitting 35 to 40 feet from where the transaction occurred and was watching the events as they transpired.

Immediately after this testimony, the district judge struck it from the record and instructed the jury to block it from their minds. The judge stated that he had thought that Rivera had been closer to the transaction when he initially decided that the requirements of Rule 404(b) had been met, but given the distance to which Perez actually testified, he did not believe that "the facts would be sufficiently convincing, clear and convincing so that they would support a jury verdict that there was participation [by Rivera]."

■ Rivera claims that the jury could not have blocked out the tainted testimony and as a result the jury's verdict must be reversed. In response, the government appears to argue that the evidence was admissible under Rule 404(b), or, if it was not, its erroneous admission was harmless error,

particularly in light of the fact that the evidence was immediately struck and the jury appropriately instructed.

■ The decision whether or not to admit evidence under Rule 404(b) belongs to the district court; we review for abuse of discretion. *United States v. Smith*, 995 F.2d 662, 671 (7th Cir.1993); *United States v. Wilson*, 985 F.2d 348, 352 (7th Cir.1993); *United States v. Torres*, 977 F.2d 321, 325 (7th Cir. 1992). We note that the district court appears to have applied too stringent a test to the evidence given the Supreme Court's decision in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (evidence must only allow the jury to reasonably conclude that the act occurred). Although we previously required Rule 404(b) evidence to be clear and convincing, *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984), since *Huddleston*, we only require such evidence be sufficient to support a jury finding that the defendant committed the similar act. *Smith*, 995 F.2d at 671 (citing *United States v. Penson*, 896 F.2d 1087, 1091 (7th Cir.1990)); *Wilson*, 985 F.2d at 353. Consequently, it is possible that had the district court applied the less rigorous test, it might have concluded that the evidence passed muster. However, we need not speculate further because even if the admission of Perez's testimony was error, it was harmless error. *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988) (erroneous admission of Rule 404(b) evidence harmless if jury not "substantially swayed by the error").

■ On direct appeal, a nonconstitutional error is harmless if we are convinced that it did not substantially affect the jury's decision. *United States v. Toushin*, 899 F.2d 617, 625 (7th Cir.1990). We are satisfied that the jury's verdict was not substantially influenced by the tainted evidence for two reasons. First, the testimony was immediately stricken and the jury was instructed to disregard it. We presume the jury followed that instruction. *Zafiro*, —— U.S. at ——, 113 S.Ct. at 939. Second, after reviewing the other damning evidence against Rivera, we believe the jury had more than sufficient evidence on which to base its verdict. As a result, we cannot say that the jury's verdict

was substantially influenced by the evidence, much less that it would have been different but for the admission of Officer Perez's testimony.[15]

**Heredia**

Heredia raises a different issue regarding Rule 404(b), but fares no better than Rivera. Officer Perez also testified against Heredia. Officer Perez stated that he had been part of a team which arrested Heredia for selling a kilogram of cocaine on January 5, 1989. Heredia subsequently pled no contest to the charge against him, a fact not disclosed by Officer Perez. Heredia contends that the admission of this testimony was reversible error.

Rule 404(b) evidence is admissible if:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Smith*, 995 F.2d at 671. As mentioned above, we review the district court's ruling only for an abuse of discretion. *Id.*

Heredia's first argument is that the district court did not exercise "principled" discretion but merely mechanically applied the four-part test. *See United States v. Hudson*, 843 F.2d 1062, 1065 (7th Cir.1988) (appellate court reviews to ensure that the district court's analysis "went beyond a mere mechanical invocation" of the test). This meritless claim significantly mischaracterizes the record. The truth is the district judge carefully considered how each factor of the test applied to the facts in this case.

Next, Heredia claims that the trial judge erred by permitting the government to introduce Officer Perez's testimony during its case-in-chief. Heredia contends that Rule 404(b) evidence aimed at showing intent or knowledge cannot be admitted until after the defendant has presented his case and put the question at issue. Heredia is wrong. Rule 404(b) contains no limitation on when such evidence can be presented during trial. In fact, the notes accompanying the 1991 Amendment to the rule provide that the rule applies no matter how the government plans "to use the extrinsic act evidence at trial, i.e. during its case-in-chief, for impeachment, or for possible rebuttal." FED.R.EVID. 404, 1991 Amendment notes. Moreover, because drug conspiracy is a specific intent crime, *Smith*, 995 F.2d at 672, the government must prove intent as an element of the offense; accordingly it may introduce Rule 404(b) evidence during its case-in-chief.

Heredia also argues that Officer Perez's testimony did not "meet the quantum of the evidence" required under Rule 404(b). Heredia's initial problem is his assertion that the testimony must be clear and convincing. As we stated above, that is no longer the law; the evidence must support a jury finding that the defendant committed the similar act. *Id.* at 671; *Wilson*, 985 F.2d at 353. An arresting officer's eyewitness testimony certainly could be sufficient to support such a jury finding.[16]

Finally, to the extent that Heredia is claiming that the prejudicial value of the evidence outweighed its probative value, we disagree. Officer Perez's testimony was probative on the issue of whether Heredia knowingly joined the conspiracy and in fact intended to distribute cocaine. When evidence is particularly probative, we will tolerate a higher risk of prejudice. *Smith*, 995

---

**15.** Rivera also argues that the combination of the 404(b) evidence and the mutually antagonistic defenses worked together to subject him to intolerable prejudice. For the reasons that we have concluded that each issue alone does not require reversal, we also conclude, considering the issues in tandem, that there is no reversible prejudice.

**16.** Heredia's claim that Officer Perez's testimony was lacking because he did not set up the cocaine buy but was merely present when Heredia was arrested is meritless. Officer Perez testified that Heredia drove up alone in a car, opened his trunk, showed the undercover agent the cocaine, and was arrested. Such testimony is more than sufficient to support a jury finding that Heredia committed the act.

F.2d at 672. Moreover, prejudice to Heredia was reduced by timely limiting instructions. The district judge told the jury, twice during Officer Perez's testimony and again during his final charge, that the evidence could only be considered to show Heredia's knowledge and intent. *See Wilson*, 985 F.2d at 353 (limiting instructions sufficient to cure any potential prejudice resulting from the introduction of 404(b) evidence). There was no abuse of discretion.

## V. Sufficiency of the Evidence

■ Heredia argues that his conviction is not supported by sufficient evidence. Here Heredia bears a heavy burden. We review the evidence and all reasonable inferences in the light most favorable to the government. *Smith*, 995 F.2d at 667. We do not reweigh the evidence or make credibility determinations. *Id.; United States v. Maholias*, 985 F.2d 869, 874 (7th Cir.1993). Heredia's conviction must be affirmed as long as any rational jury could find all the elements of the crime beyond a reasonable doubt. *Goines*, 988 F.2d at 758.

■ To convict Heredia of conspiracy, the prosecution must prove that a conspiracy existed and that Heredia knowingly joined it. *Smith*, 995 F.2d at 666. The government can meet its burden of proof with solely circumstantial evidence. *Id.* After reviewing the record, we are satisfied that Heredia's conviction rests on sufficient evidence.

Heredia does not argue that the government failed to prove a conspiracy. Rather, he claims that there was no evidence that he joined it. We read the record quite differently. Rodriquez testified that Heredia helped load Rivera's van with cocaine. By his own admission, Heredia picked up the van in Utah and drove it to Milwaukee. There was evidence that Heredia called the Milwaukee coconspirators during this trip, as well as received money they wired to him. There was also evidence that Heredia sat at a kitchen table while cocaine was unloaded. Finally, Heredia admitted he was paid for his efforts. This circumstantial evidence was more than sufficient to allow the jury to conclude that Heredia knowingly joined the conspiracy to distribute cocaine.

## VI. Rivera's Sentence

To compute Rivera's offense level, the district court determined that he was responsible for at least fifteen kilograms of cocaine. As a result, Rivera was assigned a base offense level of 34. U.S.S.G. § 2D1.1(c) (Drug Quantity Table). The district court reached a total of fifteen kilograms by adding the following amounts: (1) four kilograms delivered by Rivera and his coconspirators to Sioux City between November 1990 and January 1991; (2) two kilograms delivered to Castellanos in Milwaukee before the May 1991 load; (3) eight kilograms packed into Rivera's van for the May 1991 load; and (4) one kilogram converted from monies alleged to be drug sale proceeds.

■ We review sentences imposed under the Sentencing Guidelines with a deferential eye. *United States v. Duarte*, 950 F.2d 1255, 1262 (7th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). "We will uphold a sentence as long as the district court correctly applied the Guidelines to findings that were not clearly erroneous." *Id.* Indeed, "we will not disturb the district court's [factual] findings unless we are left with the definite and firm conviction that a mistake has been made." *United States v. Nunez*, 958 F.2d 196, 198 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992). "The quantity of drugs used for calculating the defendant's offense level is a question of fact...." *United States v. Cedano–Rojas*, 999 F.2d 1175, 1178 (7th Cir.1993).

Rivera contends that the district court included too many kilograms of cocaine in his base offense level. Specifically, Rivera objects to the inclusion of the Sioux City four kilograms, the Milwaukee two kilograms and the one kilogram converted from currency. "[A] defendant who challenges factual allegations in the PSR [presentence report] has the burden of producing some evidence beyond a bare denial that calls the reliability or correctness of the alleged facts into question." *United States v. Isirov*, 986 F.2d 183, 185 (7th Cir.1993). *See also United States v. Westbrook*, 986 F.2d 180, 183 (7th Cir.1993);

*United States v. Coonce*, 961 F.2d 1268, 1279 (7th Cir.1992).[17] The burden of convincing the court that the PSR facts are true only shifts back to the prosecutor if the defendant carries his burden of production. *Isirov*, 986 F.2d at 186. The only time when a defendant can possibly succeed with a mere denial is " 'in the case of a naked or unsupported charge.' " *Westbrook*, 986 F.2d at 183 (citing *Coonce*, 961 F.2d at 1279). We note at the outset that Rivera presented no evidence at his sentencing; rather, he only made denials and challenges through the argument of counsel. Therefore, unless the government's allegations are unsupported, Rivera's objections must fail.

■ Rivera claims that the four kilograms delivered to Sioux City should have been excluded because they were delivered as part of a separate conspiracy. The district court is required to increase a defendant's base offense level by applying the "aggregation rule." *Duarte*, 950 F.2d at 1263 (interpreting U.S.S.G. §§ 1B1.3(a)(2) and 3D1.2(d)). Under this rule, the offense level is increased "to account for 'relevant conduct,' which includes drugs from any acts that 'were part of the same course of conduct or common scheme or plan' as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts." *Id.* *See also Cedano–Rojas*, 999 F.2d at 1178–79; *Nunez*, 958 F.2d at 198. Hence, the district court properly included the four kilograms as long as it made a supportable finding that the Sioux City drug transactions were part of the same course of conduct or part of a common scheme. The district court made just such a finding.

In concluding that the four kilograms could be counted, the district court stated:

> I legally don't have much doubt about the Iowa situation. It's the same participants. It's the same material. The only thing that's different about it is that it was being distributed in a different place and it was when the arrests started there [in Sioux City] that the whole thing was transferred to Milwaukee.

. . . . .

The district court considered precisely the right factors to determine whether there was a common scheme: presence of similar parties, the temporal relationship, and the geographical relationship. *See Cedano–Rojas*, 999 F.2d at 1181; *Duarte*, 950 F.2d at 1264. Its factual finding that the Sioux City conduct was relevant for sentencing was not clearly erroneous.[18]

Indeed, contrary to Rivera's assertion, it was supported by evidence adduced at trial. Rivera contends that one witness' testimony that Rivera personally delivered one kilogram to Sioux City is insufficient to support the court's finding. "The testimony of one witness, even one arguably biased against the defendant, is sufficient to support a finding of fact." *Cedano–Rojas*, 999 F.2d at 1180. *See also United States v. Caicedo*, 937 F.2d 1227, 1236 (7th Cir.1991). Moreover, the witness, Roselio Lomeli–Perez, testified that Rivera and Estrada were responsible for bringing 4 kilograms to Sioux City. Rivera does not have to deliver every kilogram personally in order to be held liable. Relevant conduct includes "all reasonably foreseeable acts and omissions of *others* in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added).

■ Rivera next objects to the inclusion of the two kilograms delivered to Castellanos in Milwaukee before the ill-fated eight kilogram shipment. Rosa Ibanez testified that Padilla brought more than one kilogram of cocaine from Los Angeles to Castellanos on at least two occasions. She further testified that Castellanos sent money back to Estrada after he received proceeds from the sale of

---

**17.** Although Rivera does not frame his argument as a challenge to the government's allegations in his PSR, he does challenge the district court's factual finding based on the PSR. Therefore, we believe these principles are applicable.

**18.** Although Rivera does not specifically argue that this conduct should not be included because it preceded the time frame of the indictment, we note that such an argument would fail. In *Cedano–Rojas* we held that transactions which preceded the charged offense could be used to supply the total amount of cocaine for sentencing purposes. 999 F.2d at 1181. *See also Nunez*, 958 F.2d at 198 (prior unindicted sales were relevant conduct for sentencing purposes).

that cocaine. This testimony was sufficient to support the district court's finding that Rivera was responsible for the two kilograms. *See Cedano–Rojas,* 999 F.2d at 1180.

■ Rivera's final objection relates to the district court's inclusion of one kilogram by converting alleged drug proceeds into their drug equivalency. Rivera has two objections: (1) the Guidelines do not permit the district court to convert cash into an amount of cocaine for base level offense purposes; and (2) the conversion was without a sufficient factual basis.

Rivera's first argument is unpersuasive. While we have not specifically ruled on this issue, four other circuits have held that seized currency may be converted to its equivalent in drugs for purposes of sentencing. *See United States v. Jackson,* 990 F.2d 251, 253 (6th Cir.1993); *United States v. Hicks,* 948 F.2d 877, 881–83 (4th Cir.1991); *United States v. Stephenson,* 924 F.2d 753, 764–65 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); *United States v. Gerante,* 891 F.2d 364, 386–70 (1st Cir.1989). *But see United States v. Gonzalez–Sanchez,* 953 F.2d 1184, 1187 (9th Cir. 1992) (conversion improper in instant case because no factual finding that money was connected to the drug business). We agree that the Guidelines authorize such conversions.

■ As mentioned above, § 1B1.3 permits the consideration of other "relevant conduct." In addition, the commentary accompanying § 2D1.4 permits the district court to consider financial evidence when sentencing.

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.4, Application Note 2. Therefore, we hold that the district court may convert seized currency into an equivalent amount of the charged drug as long as the government proves the connection between the money seized and the drug-related activity. *See Cedano–Rojas,* 999 F.2d at 1179 (government bears burden of proving defendant's connection with drugs included in calculation by a preponderance of the evidence); *United States v. Ruiz,* 932 F.2d 1174, 1183–84 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991); *United States v. White,* 888 F.2d 490, 499 (7th Cir.1989).[19] We will review the district court's factual finding on this issue for clear error, the standard employed when we review findings on the quantity of drugs used for calculating a defendant's offense level. *See Cedano–Rojas,* 999 F.2d at 1179. *United States v. Mahoney,* 972 F.2d 139, 141 (7th Cir.1992).

With these standards in mind, we examine whether the conversion has a sufficient factual basis. In this case, there was evidence of drug sale proceeds attributable to the conspiracy totalling $390,000: $90,000 in cash found when Castellanos was arrested in Milwaukee, and Western Union and Federal Express receipts showing $300,000 sent to the Los Angeles conspirators from the Milwaukee conspirators. The evidence at trial was sufficient to prove, by a preponderance of the evidence, a connection between the money and receipts and the conspiracy's drug activity.

As for the $90,000 in currency, Agent Unger testified that approximately $40,000 was found in a Federal Express package addressed to Estrada in Los Angeles. Such testimony, in conjunction with other testimony that this was the method used by the conspirators to transfer drug money, supports a finding that the money was the proceeds of drug sales. Agent Unger also testified that another $50,000 was discovered in Castellanos' apartment along with a kilogram of cocaine and an empty kilogram wrapper

---

**19.** We also note that this conclusion is consistent with our holding in *Duarte* that a defendant's financial records of drug transactions could be used to calculate his offense level as long as there

was sufficient evidence to show that the records reflected the same conduct as the conduct charged. 950 F.2d at 1265.

marked "DELICADO." Again, this testimony supports a finding that, more likely than not, the money represented proceeds of drug transactions. As for the $300,000 in receipts, Rosa Ibanez testified that the Milwaukee conspirators sent back drug proceeds via Federal Express and Western Union during the early months of 1991. Her testimony was corroborated by the fact that Castellanos was arrested with just such a package. Thus, sufficient evidence supported a finding that the $300,000 was money made by selling cocaine.

In sum, we have $390,000, made by the conspiracy from January 1991 to May 1991, to convert into its drug equivalent. Agent Unger also testified at trial that the going price for a kilogram of cocaine in Milwaukee in the spring of 1991 was $20,000 to $25,000. If we divide $390,000 by $25,000, we reach a drug equivalency amount of 15.6 kilograms of cocaine. However, we have already included ten kilograms distributed in Milwaukee during the same time frame. Because there is no evidence from which we can conclude that the $390,000 represented profits above the ten kilograms we have already counted, we must subtract ten kilograms. The government may convert currency into its drug equivalent but it may not double-count.

In the instant case, however, there is no problem with double-counting. One kilogram from the money and receipts is needed to reach fifteen kilograms. Even after subtracting the ten kilograms in order to avoid any double-counting problem, we are left with 5.6 kilograms; 4.6 more than required to affirm Rivera's sentence.

We note that the district court followed a slightly different course to reach its result. The district judge refused to convert the $300,000 amount because he erroneously believed that there had been no testimony regarding the price of a kilogram of cocaine in Milwaukee during the relevant time period, leaving him without a denominator for his calculation. Instead, the district judge concluded that the $90,000 cash amply provided the basis to convert one kilogram.

We prefer not to rely solely on the $90,000 because of the possibility of a double-counting problem. Castellanos had just received six kilograms of cocaine four days before his arrest. The money found when he was arrested could represent proceeds from those six kilograms, which have already been counted in calculating his base offense level. The government presented no evidence on this issue. As a result, there could be double-counting. However, we affirm outright rather than return the issue to the district court because it is clear from the record that the district court would have converted the $300,000 to its drug amount equivalency had it been properly informed of Agent Unger's trial testimony. Thus the court still would have found Rivera responsible for fifteen kilograms of cocaine in calculating his base offense level. *See United States v. Lincoln*, 956 F.2d 1465, 1470 (8th Cir.) (appellate court can affirm sentence on "any ground supported by the record even if that ground was not relied upon by the District Court."), *cert. denied,* —— U.S. ——, 113 S.Ct. 259, 121 L.Ed.2d 190 (1992). *See also Williams v. United States,* —— U.S. —— – ——, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992) (even when the district court misapplies the Guidelines in determining a defendant's sentence, a remand is not necessary if "the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed.").

Having found Rivera's objections to included amounts of cocaine to be without merit, we conclude that the district court's finding on the quantity of cocaine used to calculate Rivera's offense level was correct and the error in reaching the fifteen kilograms was harmless. Rivera's sentence was not improper.

## VII. Conclusion

Based on the foregoing reasons, the convictions of Victor Rivera and Mario Heredia are AFFIRMED. Likewise, Victor Rivera's sentence is AFFIRMED.