46 F.3d 1134
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles WALKER, Defendant-Appellant.
 No. 92-3897.
 United States Court of Appeals, Seventh Circuit.
 Submitted Dec. 21, 1994.[1]
Decided Dec. 21, 1994.
Rehearing Denied Feb. 6, 1995.
 
 Before POSNER, Chief Judge, and CUMMINGS and MANION, Circuit Judges.
 
 ORDER
 
 1
 Defendant Charles Walker was convicted of conspiracy to distribute cocaine base in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and was sentenced to 188 months' imprisonment. On appeal, defendant argues that the evidence showed only that he bought cocaine base for resale, and not that he was a member of the conspiracy.
 
 Background
 
 2
 In 1991, a drug conspiracy involving defendant and six other people was uncovered in Madison, Wisconsin.[2] Three of the co-conspirators testified against defendant at trial. Robert Ivory testified that soon after he moved to Madison, he contacted his mother (Eddie Mae Ivory) and her boyfriend (Cleo Hightower) in Chicago to report that people in Madison would pay twice what Chicagoans were paying for crack cocaine. Eddie Mae and Cleo began travelling to Madison on weekends. Pleased with the amount of business available, they recruited street sellers who sold crack on consignment.
 
 
 3
 Robert testified further that Cleo reported defendant was selling large quantities for him and that it was hard to keep up with the amounts defendant requested. Robert saw defendant bring money to Cleo, usually several thousand dollars, and saw him take more crack to sell. Cleo also told Robert that defendant helped Cleo and Eddie Mae find an apartment in Madison. Robert also testified that he saw defendant minutes after Cleo and Eddie Mae were arrested at their apartment. Defendant said he had $3,500 to give Cleo; Robert told him to keep the money until Cleo's bond hearing, which Robert and defendant later attended.
 
 
 4
 Cleo Hightower testified that defendant was a reliable crack cocaine seller for him. Cleo testified that he and defendant "was kind of maneuvering a bit together" They "was kind of in a little thing together." The government questioned Cleo on direct examination:
 
 
 5
 Q. * * * What were you doing together?
 
 
 6
 A. Selling crack, some cocaine.
 
 
 7
 Q. Together?
 
 
 8
 A. Yeah.
 
 
 9
 Q. How long had you been doing that?
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 A. A couple months.
 
 
 13
 Cleo testified further that defendant sold about 1- 1/2 to 2 ounces each week:
 
 
 14
 A. * * * I had to pay him.
 
 
 15
 Q. You had to pay him?
 
 
 16
 A. Yeah.
 
 
 17
 Q. What do you mean?
 
 
 18
 A. For selling it.
 
 
 19
 Q. After he paid you back?
 
 
 20
 A. No. See, I gave--I was paying him to sell it. I didn't know anyone here [in Madison].
 
 
 21
 Q. Right.
 
 
 22
 A. I had to get someone here who knowed the peoples.
 
 
 23
 Cleo often paid defendant with an ounce of crack cocaine, which defendant could sell and keep the proceeds. When Cleo was in Chicago, he would leave crack for defendant with Eddie Mae. Defendant would drop off sale proceeds and pick up more crack. Cleo also testified about defendant helping him find an apartment to use as a base of operations in Madison. Cleo leased a pager for defendant and gave him codes to use. After Cleo was arrested, defendant visited him in jail, arranging to sell crack to raise money for a lawyer.
 
 
 24
 Eddie Mae testified similarly. Montrell Shief, another co-conspirator, also testified similarly and added that he heard Cleo talk about the large quantity of crack that defendant sold for him.
 
 Discussion
 
 25
 In reviewing the sufficiency of the evidence, we view all evidence, and reasonable inferences drawn therefrom, in a light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. United States v. Zarnes, 33 F.3d 1454 (7th Cir.1994).
 
 
 26
 Defendant argues that he "agreed only to buy the cocaine. He did not agree to become a member of a conspiracy." Defendant concedes that, given the quantities involved, Cleo "probably" knew defendant was buying "for more than [defendant's] personal use." He maintains that buying for resale does not mean he and Cleo had the type of agreement necessary for a conspiracy. A criminal conspiracy requires an agreement to commit a crime beyond a straightforward selling and buying of drugs. United States v. Lechuga, 994 F.2d 346, 349-51 (7th Cir.) (en banc), cert. denied, 114 S.Ct. 482 (1993).[3] In the three months of doing business together, Cleo and defendant had established "prolonged cooperation," a factor in inferring conspiracy in Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943), and discussed by this court in Lechuga, 994 F.2d at 350 ("Prolonged cooperation is neither the meaning of conspiracy nor an essential element, but it is one type of evidence of an agreement that goes beyond what is implicit in any consensual undertaking, such as a spot sale").
 
 
 27
 The evidence established that the entire relationship, from the time Cleo entered the Madison drug scene, centered around Cleo and defendant developing and executing an agreement under which defendant would sell crack cocaine on Cleo's behalf. Cleo had a source for crack in Chicago, and defendant had customers in Madison--an arrangement that worked to both their advantage. Defendant earned either a weekly salary of about $1,400, or was paid in drugs. In fact, the arrangement was beneficial enough to defendant that he was willing to help Cleo and Eddie Mae locate an apartment in Madison to use as a base of operations. Defendant and Cleo contacted each other on beepers leased by Cleo, using codes provided by Cleo. When Cleo was in Chicago, defendant's routine was to stop by the Madison apartment and make the money-crack exchange with Eddie Mae. The shared apartment search, the consignment arrangements, and the standardized procedural reflect the depth of trust that was established in this relationship within a relatively short time.[4]
 
 
 28
 Defendant argues that there is no difference between "one who buys for resale with cash and one who buys for resale on what amounts to consignment." Not so. Sale for resale without credit--a straight payment in full for goods received--involves very little element of trust (there is still the possibility you're selling to an undercover agent). Handing someone three, five, or ten thousand dollars worth of crack cocaine with no security deposit, no collateral, no guarantee of return, requires trust, a necessary risk in order to prevent the chain of distribution from breaking down. See Lechuga, 994 F.2d at 348 ("If all drug dealers were constrained to sell at retail the drug trade would be smaller than it is...."). See also United States v. Clay, 37 F.3d 338 (7th Cir.1994) ("when a sales relationship is ongoing, seller and buyer will to some degree share an interest in the fortunes of the other; the buyer would like the seller to continue to have access to a supply and the seller would like the buyer to continue to have access to a market").
 
 
 29
 We have said that not every sale of drugs for resale automatically tips the buyer and seller into a conspiracy, but we have repeatedly shown how the various factors can intermix, as here, to show far more than a seller's relationship with a buyer who happens to plans on reselling the drugs. See, e.g., United States v. Sax, Nos. 93-3063, 93-3288 (7th Cir. Nov. 7, 1994), slip op. at 9 (sale for resale, plus large quantities of drugs, prolonged cooperation between the parties, standardized dealings over two years, and working on a credit or "front" basis); United States v. Clay (sale for resale, plus "fronting" the drugs, use of pager and agreed codes, periodical meetings, records of ongoing account established when the "conspiracy crystallized"); United States v. Zarnes (sale for resale, plus large quantities, prolonged cooperation, consignment basis, and standardized dealings with one another); Lechuga, 994 F.2d at 348-49 (sale for resale, plus seller's knowledge that his buyer was assisting to distribute drugs to another dealer farther down the chain of distribution). We conclude that the evidence established that defendant was a member of the conspiracy, and not merely a buyer of crack cocaine.
 
 Sentencing
 
 30
 Defendant contends that the district court erred its findings regarding drug quantity. The judge based the finding on her recall--which was accurate--of the testimony of Cleo Hightower and Eddie Mae Ivory. We will not disturb a district court's finding of fact as to drug quantity unless it is clearly erroneous and leaves this court with a definite and firm conviction that a mistake has been made. United States v. Rivera, 6 F.3d 431, 444 (7th Cir.1993), cert. denied, 114 S.Ct. 1098 (1994).
 
 
 31
 The probation officer noted that "[s]ince Walker was 'the last one in,' the quantities of cocaine base attributed to him were much higher than those attributable to the co-conspirators, who were now free to 'tell all.' " The probation officer found that between 150 to 500 grams of cocaine base was attributable to defendant. He recommended the low range of the 188 to 235 month range applicable to a level 34 offense. The district court adopted the probation officer's recommendation and sentenced defendant to 188 months' imprisonment. The court found that the figure of 168 grams sold during July through September 1991 was based on the testimony of Cleo and other witnesses.[5]
 
 
 32
 Cleo testified that defendant was selling, "Ounce and a half, two ounces maybe twice a week." He later testified:
 
 
 33
 Q. During these deliveries to [defendant], how much crack cocaine were you giving him?
 
 
 34
 A. An ounce, ounce and a half until it was his time to get paid. Then I'd give him one for the selling.
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 Q. How many times while you had the lease at 1128 did you leave packages with Eddie Mae for Charles Walker while you were going to be working in Chicago, or how often.
 
 
 38
 A. I guess once or twice.
 
 
 39
 Q. Once or twice a week, a month/the whole time?
 
 
 40
 A. A week. Once a week because I only come in on the weekends. If I don't get a chance to see him, he was out on the street somewhere, you know, and I had to get on back, I would leave it with her to give to him.
 
 
 41
 Q. So, am I correct, is your testimony that every week you would see him somewhere or leave some for him?
 
 
 42
 A. Just about it.
 
 
 43
 Q. Same size package?
 
 
 44
 A. No. Sometime I wouldn't have enough. Sometime a guy would be running low, you know, and I'd just pick up what he had. Sometime he have two ounces, sometime an ounce and a half, sometimes an ounce and a quarter. I just pick up what he have.
 
 
 45
 The district court judge acknowledged that Cleo's testimony was credible on some points, one of which was the minimum quantity of crack cocaine defendant was dealing. She found that Cleo testified that defendant sold "1- 1/2 to 2 ounces twice a week." Credibility determinations made by a sentencing judge are entitled to great deference and will rarely be disturbed on appeal. United States v. Kosinski, 16 F.3d 795, 820 (7th Cir.1994). Moreover, Cleo's testimony was corroborated by Robert Ivory's testimony that Cleo said defendant was selling large amounts, and Robert's observation that when defendant brought money to Cleo, it was usually several thousand dollars. Robert also testified that when he saw defendant shortly after Hightower was arrested, defendant said he had picked up five or six quarter-ounce packages of crack cocaine from Cleo, and he had $3,500 to give Cleo. It was also corroborated by Eddie Mae's testimony that several times she delivered one-ounce packages of crack to defendant. The time between Cleo's arrival in Madison and his arrest was three months, resulting in a total of 168 grams, and an offense level of 34. No error occurred.
 
 Conclusion
 
 46
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 After preliminary examination of the brief, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and record
 
 
 [2]
 The factual background of the conspiracy is more fully set out in United States v. Ivory, 11 F.3d 1411 (7th Cir.1993). Here we focus on the evidence relating to defendant's connection to the overall conspiracy
 
 
 [3]
 We note that, as in Lechuga, there is a seller (Cleo) and a local sales agent (defendant), but unlike Lechuga, the present case does not involve a named third party to whom the sales agent made the resale. In Lechuga, however, the only reason the named third-party buyer was of special interest was because of defendant's challenge to the indictment. Here, the identities of the third-party buyers is of no relevance to the legal issues raised by defendant
 
 
 [4]
 Also, it is of some significance that defendant sold large quantities. He argues, however, that "a buyer of large quantities is still just a buyer." It is true that large quantities, without more, cannot support a conviction for a drug conspiracy. Lechuga, 994 F.2d at 347. Nevertheless, the quantity carries some significance in the factual setting of each case
 
 
 [5]
 Cleo and Eddie Mae pled guilty to conspiracy to possess and distribute cocaine and cocaine base, and were held accountable for between 50 to 150 grams of cocaine base, and each sentenced to 151 months' imprisonment. Robert Ivory also pled guilty, and his relevant conduct was found to involve between 5 and 20 grams of cocaine base, and he was sentenced to 63 months' imprisonment